(Decided 30th March, 1880.)

GEORGE S BROWN *vs.* WILLIAM H. WARD, WILLIAM A. FISHER and BERNARD CARTER. Executors of JANE BAY.

*Presumption of the Sanity and Mental Capacity of a Testator —Proof as to a Testator's alleged Unsoundness of Mind— Spiritualism—Delusions that invalidate a Will—The Question of Sanity for the Jury—Prayers.*

Sanity and mental capacity are presumed in law, and this presumption exists as well in reference to last wills and testaments as to other matters. The burden of proof rests, as a consequence, upon those who allege the contrary. An alleged unsoundness of mind of a testator, must be shown to exist at the time of the execution of the will. If a testator is shown to have been of unsound mind prior to the time of making his will, and such unsoundness was of a permanent character, then the presumption of law in favor of his sanity would no longer exist; while if it is shown, that such unsoundness was temporary and occasional, and not permanent and continuing, the presumption of sanity arises.

Hostility and aversion to those who are bound to one by the ties of kindred and blood are admitted as proof upon the question of sanity not alone, because there exists such hostility, but because it is altogether without cause or based upon some delusion. In offering evidence upon this point, a caveator should offer all the evidence he has in reference to it before closing. He cannot offer a

Brown *vs.* Ward, *et al.*, Ex'rs.

part and wait until the other side has closed, and then offer the other part as rebutting evidence.

A caveator under the issue of testamentary capacity *vel non*, having offered evidence in chief, that the testatrix was a spiritualist and consulted the spirits about her business transactions, and also evidence about a particular transaction as to which she consulted the spirits, should complete the proof he has commenced, and having failed to do this, he cannot afterwards introduce such evidence by way of rebuttal.

The mere belief of a testatrix in various phases of spiritualism claimed to be extravagant and unfounded delusions, is not of itself sufficient to prove, that she did not possess the capacity that the law requires to make a will.

The delusion that will invalidate a will, must point to actual unsoundness of mind, in other words, it must be an insane delusion.

The question of sanity in proceedings by a caveator to invalidate a will, being one of the direct issues on trial, is a fact to be determined and decided by the jury, and not by the Court, upon all the circumstances and proof in the case. The Court cannot say as matter of law, that a person is insane, because he holds the belief, that he can communicate with spirits, and can be, and is advised and directed by them in his business transactions, and in the disposal of his property. Such beliefs do not of themselves afford a certain test of insanity or want of testamentary capacity.

Courts will not grant a multiplicity of prayers substantially of the same tenor.

APPEAL from the Circuit Court for Howard County.

Jane Bay, a resident of Baltimore City, died 4th July, 1876, and certain paper-writings being propounded in the Orphans' Court of Baltimore City as her last will and codicils thereto, a caveat was filed by the appellant, a nephew and one of the heirs-at-law of the deceased. Issues were made up and sent for trial to the Baltimore City Court, from which, upon the suggestion of the defendants, the executors, they were removed to the Circuit Court for Howard County, where the trial was had.

The case is further stated in the opinion of the Court.

*3rd Exception.*—At the trial, after the introduction of the testimony set forth in two preceding bills of exceptions of the plaintiff, (which testimony is substantally 'stated in the opinion,) the plaintiff offered the following thirteen prayers:

1. If the jury find, that Jane Bay was under the influence of any insane delusion or delusions, with respect to the disposition of her property, and that her will, dated the 26th March, 1874, and the codicils thereto, were the direct consequence and offspring of such delusion or delusions, then they should find for the plaintiff upon the second, fifth and eighth issues. And the meaning of an insane delusion, in its legal sense, is the belief in things impossible, or the belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credence.

2. If the jury find that Jane Bay was under the influence of any insane delusion or delusions, permanently fixed on her mind at the time the will dated 26th March, 1874, and the codicils thereto in evidence in this case, were executed by her, although they should find the said will and codicils were not the direct consequence and offspring of the said delusion or delusions; yet it is a question for the jury to determine, whether the intellect of the testatrix was so disordered as to have rendered her at the time of executing the said will and codicils, not of a sound and disposing mind and capable of executing a valid deed or contract.

3. If the jury find that Jane Bay labored under insane delusions, which affected her mind in the disposal of her property by the will and codicils in evidence, and that, but for the influence of such delusions the said will and codicils would not have been made by her, then they should find for the plaintiff upon the issues as to her testamentary capacity at the time of executing the said writings, although the jury should further believe that

the said Jane Bay conducted her ordinary business with shrewdness and apparent discretion, and did not make any exhibitions of insanity to many persons who were brought into contact with her.

4. It is the province of the jury to decide upon the testamentary capacity of Jane Bay, at the time of the execution of the will and codicils which have been offered in evidence, and in so doing it is competent for them to take into consideration the existence in her of an hereditary tendency or predisposition to insanity; that she habitually and constantly labored under insane delusions; the circumstances and associations by which she was surrounded; that she was in infirm health, and before the time of the making of said will exhibited indications of disease of the brain, had a stroke of paralysis within a year afterwards and eventually died of paralysis, if they shall find such facts.

5. If the jury find that Jane Bay labored under a false, unfounded and irrational delusion as to the character of her near relations, and that under the influence and control of the said delusion, she made and executed the will and codicils in question, and was brought to dispose of her property therein, as, if her mind had been free from such delusions, she would not have done, then she was not, at the time of executing the same, of that sound and disposing mind which the law requires.

6. It is the province of the jury to decide upon the testamentary capacity of Jane Bay at the time of the execution of the will and codicils in question, and in doing so it is competent for them to take into consideration, in connection with all the other evidence in the case, an hereditary predisposition to insanity, (if such they shall find to have existed in her,) and the presence in her mind of insane delusions, (if such they shall find,) and if upon all the evidence, they shall find that she was of unsound mind; and that such delusions were habitually

and constantly present with her, although they were not, at all times, called into exhibition; and that the said will and codicils were made under the influence of such delusions, and were the direct offspring thereof, then they must find for the plaintiff, upon the second, fifth and eighth issues, although the jury should also find that the said Jane Bay made deeds and leases, and conducted her affairs generally, with acuteness and intelligence, and in all her ordinary business, appeared rational and sane.

7. If the jury find that Jane Bay labored under a causeless and irrational delusion as to the character and motives of her relatives, such as a sane mind would not have entertained, and influenced and controlled by the said delusion, made the will and codicils in question; and that but for said delusion, they would not have been made, then she was not, at the time of making the same, of sound and disposing mind, and their finding should be for the plaintiff upon the said second, fifth and eighth issues.

8. That the verdict of the jury in this case cannot affect the validity of any deeds or contracts alleged to have been made by the deceased at any time, with other persons not parties to this cause.

9. If the jury find that Jane Bay entertained a delusion that the spirit of her deceased brother had sent her a communication from the other world, enjoining upon her to make provision for Jacob H. Weaver, and that said delusion was unreal and false; and shall further find that the will dated the 26th March, 1874, was the offspring and direct consequence of said delusion; and that but for such delusion, and her belief in the reality thereof, such a will would not have been made, then the said will is not entitled to stand as the valid will of the said Jane Bay.

10. That if the jury find, at the time of the execution of the will in this cause, the said Jane Bay believed that the spirits of her deceased relatives could and did return

from the spirit-land to earth, and that the said spirits, in their natural form, could commune with, counsel and advise her in reference to the affairs of this world and the disposition of her property; and if they further find that these spiritual communications had any influence upon the mind of the deceased in making said will, in disregard of the claims of natural affection, if they shall find such disregard therein, then their verdict must be for the plaintiff upon the second, fifth and eighth issues.

11. If the jury find that Jane Bay believed that she was directed by spirits of the departed to accept Jacob H. Weaver as her spiritual child, and to provide for him as such, in order to develop her for a proper sphere in the future life, and acted on that belief, such belief in law amounted to a delusion, and the will, if it was the result or consequence of such delusion, in any respect, is not the valid will of the said Jane Bay.

12. If the jury find that Jane Bay believed that she was directed by the spirits of her deceased ancestors, to found a home for boys, in order to perpetuate the family name, and her will was the result or consequence of her belief that she had received such direction from such source, then the will should not be allowed to stand as the valid will of said Jane Bay.

13. That if the jury find that before the time of executing the said will and codicils, the mind of the said Jane Bay was disordered and unsound, and that she labored under insane delusions, as defined in the plaintiff's first prayer, and that said mental unsoundness was of a permanent character, then the general presumption of sanity is overcome in her case.

And the defendants offered the following eleven prayers:

1 That the due execution of the will and of the codicils being admitted by the plaintiff, the verdict of the jury must be for the defendants on the first, fourth and seventh issues.

2. That the plaintiff has offered no evidence legally suffi-
cient to show that the will and codicils, or any one of them,
were procured by undue influence of any person or persons,
and that the verdict of the jury must be for the defend-
ants on the third, sixth and ninth issues.

3. That the presumption of law is that the testatrix, Jane
Bay, was of sound mind at the time she executed the will
offered in evidence, and that the plaintiff is bound to
satisfy the jury that said Jane Bay was not of sound mind
at the time she executed said will, otherwise their verdict
must be for the defendants on the second issue; and the
defendants further pray the Court to instruct the jury,
that the same rule of law is applicable to the fifth issue,
with reference to the first codicil, and to the eighth issue
with reference to the second codicil.

4. That if the jury find from the evidence that Jane Bay
was, at the time of executing the will offered in evidence, of
sound and disposing mind, and capable of making a valid
deed or contract, then she had sufficient mental capacity,
under the law of Maryland, to enable her to make a valid
will, and what is meant by the words "sound and disposing
mind, and capable of making a valid deed or contract,"
in respect to making a will, is that she understood the
nature of the business she was engaged in, recollected the
property she meant to dispose of, and the persons to whom
she meant to give it, and understood the manner in which
she disposed of it, and the relative claims of the different
persons who are or might be the objects of her bounty.—
(The Court granted this prayer as a correct definition of
testamentary capacity, to be considered by the jury in con-
nection with all the other instructions granted in the case
upon that subject.)

5. That the mere belief of the testatrix, Jane Bay, that
it is possible to see and hear spirits so-called, and to heal
diseases and relieve pain by touch, and to foretell what has
not yet happened, or to know what has occurred at distant

places, and her want of belief in the Bible, are not suffi-
cient, in themselves, to prove that she did not possess the
capacity that the law requires to make a will, but the jury
may consider such mere beliefs of the testatrix in connec-
tion with all the other facts and circumstances of the
case.

6. That even although the jury find from the evidence
that Jane Bay believed that she received communications
from spirits, so-called, with reference to the disposition of
her property, yet if they find that at the time of making her
will, she possessed the degree of mental capacity set forth
in the defendants' fourth prayer, their verdict cannot be
for the plaintiff on the second issue, unless they find that
the disposition of property made in said will, or some of
them, were made in consequence of her belief that she
was so controlled by and bound to obey said communica-
tions, that she did not act in accordance with her own free
will in making such dispositions of her property, and the
burden of proof is on the plaintiff to satisfy the jury that
said Jane Bay did not act in accordance with her own
free will, and she made said will in consequence of her
belief that she was so controlled by and bound to obey
said communications.

7. That although the jury may find from the evidence
that the testatrix, Jane Bay, believed that she received
supernatural communications with reference to the disposi-
tion of her property ; yet, if they find that at the time she
made her will she possessed the kind of mental capacity
described in the defendants' fourth prayer, and acted in
accordance with her own judgment, choice and discretion
in disposing of her property, and not from the belief that
she was obliged to obey such supposed supernatural com-
munication, they cannot find for the plaintiff on the
second issue.

8. That even if the jury believe that Jane Bay sometimes
had delusions of the kind mentioned by the witnesses for

the plaintiff, and that such delusions, while they continued, rendered the mind of said Jane Bay unsound, yet if the jury believe that such delusions were temporary and occasional, and not permanent and continuous, then the presumption of law is, that when the will was made the mind of said Jane Bay was free from the influence of such delusions, unless the plaintiff shall satisfy them that such delusions controlled her mind at the time she executed her will.

9. That even if the jury believe that Jane Bay had opinions and beliefs on any subject, at variance with the opinions and beliefs held by most persons in the community in which she lived, and although they may believe that the opinions and beliefs of said Jane Bay were extravagant and eccentric, yet if the jury find that at the time she made her will, she possessed the degree of capacity described in the defendants' fourth prayer, and that the provisions of her will were made by her in accordance with her own judgment and choice as to the disposition of her property, and uncontrolled by any communications which she may have believed she received from spirits, and uncontrolled by any insane delusions as defined in the plaintiff's first prayer, then their verdict must be for the defendants on the second issue.

10. That in deciding upon the mental capacity of Jane Bay, the jury may, in connection with all the other evidence in the case, consider the provisions of the will itself, so far as they may think that those provisions indicate soundness or unsoundness of mind, but the jury must not find for the plaintiff on the second issue merely because the jury may consider that the provisions of said will are injudicious, or even unjust to the relations of the said Jane Bay.

11. That all the instructions granted by the Court as to the will of Jane Bay, are equally applicable to the codicils, and in finding their verdict on the fifth and eighth issues,

the jury must be governed by all the instructions of the Court as to the second issue.

The Court, (MILLER and HAMMOND, J.,) refused the third, fourth, fifth, seventh, ninth, tenth, eleventh and twelfth prayers of the plaintiff; granted his first, second, sixth, eighth and thirteenth prayers; granted the first, second, third, fourth, fifth, eighth, ninth, tenth and eleventh prayers of the defendants; refused their sixth and seventh prayers, as offered; and gave to the jury the following further instructions of its own:

If the jury believe from the evidence that Jane Bay labored under an insane delusion as to the character of her near relatives, and that she executed the will and codicils in question under the influence and control of such delusion, and would not have so disposed of her property to their prejudice if her mind had been free from such delusion, then they must find for the plaintiff upon the second, fifth and eighth issues.

Although the jury may find from the evidence that Jane Bay believed that she received supernatural communications with reference to the disposition of her property, yet if they find that at the time she made the will and codicils in question, she possessed the mental capacity mentioned in the defendants' fourth prayer, and in the execution of said papers exercised her own free judgment and will as to the disposition of her property thereby made, uninfluenced by said supposed communications, and uninfluenced by any insane delusions as defined in the plaintiff's first prayer, then they must find for the defendants upon the second, fifth and eighth issues.

The plaintiff excepted, and the verdict being for the defendants, he appealed.

The cause was argued before BARTOL, C. J., BRENT, ALVEY, ROBINSON and IRVING, J.

*Arthur W. Machen* and *Richard J. Gittings*, for the appellant.

*Bernard Carter* and *Charles Marshall*, for the appellees.

BRENT, J., delivered the opinion of the Court.

This appeal is from the rulings of the Circuit Court for Howard County, in the trial of issues from the Orphans' Court of Baltimore City, involving the validity of the will and two codicils thereto of Miss Jane Bay, deceased.

The issues are nine in number. The first, second and third are directed to the will, the fourth, fifth and sixth to the first codicil, and the seventh, eighth and ninth to the last codicil. The first, fourth and seventh involve the due execution of these papers respectively, the second, fifth and eighth present the question of testamentary capacity, and the third, sixth and ninth the question of undue influence.

The due execution of the will and codicils was conceded, and the issues actually on trial were those of testamentary capacity and undue influence. The great bulk of the testimony was in reference to capacity, and it is with that question that we have mainly to deal.

After the evidence in chief had been closed upon both sides, the appellant, who is the caveator, offered to prove by Mrs. Rachel Bay, a competent witness and the wife of Oliver Bay, a nephew of the deceased, Miss Jane Bay, that her husband and herself and the other relatives of Miss Jane Bay, residing in Baltimore, always treated her with kindness, and did nothing to cause her to entertain dislike or antipathy for them or either of them.

Upon objection by the caveatees, the Court refused to allow the testimony to be given, on the ground that the same was not proper rebutting evidence; and this forms the subject of the first bill of exceptions.

To determine whether this testimony should have been offered in chief, or whether it comes under the class of

rebutting evidence, it is necessary to refer to the evidence which had preceded the offer.

Sanity and mental capacity are presumed in law, and this presumption exists as well in reference to last wills and testaments as to other matters. The burden of proof rests, as a consequence, upon those who alleged the contrary. *Higgins vs. Carlton*, 28 *Md.*, 141 ; *Tyson vs. Tyson's Ex'rs*, 37 *Md.*, 582. To remove this burden and to establish insanity, the caveator offered evidence in chief upon three points, as stated very concisely by appellees' counsel, to show :

1st. Insanity in some of the ancestors and near relatives of the testatrix.

2nd. That she was a believer in spiritualism, and claimed to be guided in all her actions by the direction of certain departed spirits, and that she acted under their supposed direction in making her will; and 3rd, that she had an unreasonable and uncalled for aversion to her relatives, and that the will was in part the offspring of such aversion.

Upon the last point nearly all the witnesses of the caveator testified, and some of them very strongly. Such particularly was the testimony of Mrs. Scott, Mrs. Sayward, Mrs. Fink, and others. The aversion of the testatrix to her relatives is fully gone into, and Oliver Bay and his wife are particularly mentioned as sharing her hostility and dislike. For her dislike to them she assigns her reasons, and these are testified to by some of the witnesses. To Mrs. Fink she stated, that Oliver had stolen her plank, and to Mrs. Durham, that he had tried to kill her.

Hostility and aversion to those who are bound to one by the ties of kindred and blood, are admitted as proof upon the question of sanity, not alone because there exists such hostility, but because it is altogether without cause, or based upon some delusion. The aversion of one

person to another, is by itself no proof of insanity; but coupled with the fact, that it is without cause, or is founded upon some delusion, it may be. In the present case, the fact, that the aversion of Miss Bay to her relations was without cause, and that the reasons she assigned for her dislike to any one of them particularly, were untrue, was as much a subject of evidence in chief, as was the fact of the existence of such aversion. This view seems to have been adopted at the trial, as the counsel for the caveator followed the evidence of hostility and dislike on the part of the testatrix to her relations, especially those living in Baltimore, by proof, that they all treated her very kindly, and specially referring to Oliver Bay, that there was no cause for her dislike to him.

The caveator, having offered in chief, as he could only do, evidence upon this point in his case, was required to offer all the proof he had in reference to it before closing. He could not offer a part, and wait until the other side had closed, and then offer the other part as rebutting evidence. In 1 *Taylor's Evidence, sec.* 358, the rule is stated to be this: "Where there is only one issue, the *onus* of proving which lies on the plaintiff, he must put forth all his evidence in the first instance, and cannot rely on a *prima facie* case, and after that case has been shaken by the defendant's proof, call other evidence to confirm it." In the case of *Bannon vs. Warfield,* 42 *Md.,* 39, this Court has said: "The parties must not be allowed to break up the evidence they may intend to offer on any particular issue, and introduce it at different stages of the cause by piece meal, as the varying emergencies of the case may seem to require. Such practice would not only greatly prolong trials, but would frequently lead to surprise and injustice. According to the well established practice, the plaintiff having the right to begin, must put in the whole of his evidence upon every point or issue which he opens; and in reply the plaintiff is limited to such new

points and questions as may be first opened by the defendant's evidence." See also 36 *Md.*, 588; 45 *Md.*, 176.

Now the testimony, which was offered in the first bill of exceptions and refused by the Court, is to the same point and question which had been opened by the caveator in the first instance. It has reference to the aversion and dislike of the testatrix to her relatives, and is nothing more or less than cumulative evidence, to show, that such dislike and aversion were without cause. It is not rebutting evidence, and the Court properly rejected it at the stage when it was offered.

The second exception is also to the admissibility of evidence offered by the caveator after both sides had closed in chief. This offer, like the preceding one, was refused by the Court, on the ground that the testimony proposed to be given was not rebutting evidence. The law, as stated in considering the previous exception, is applicable to this. The caveator, under the issues of testamentary capacity, *vel non*, offered a large amount of evidence that the testatrix was a spiritualist, impressed with a delusion that she could commune with spirits of the departed, that through their agency she could cure the sick, foretell future events and know what was going on in places at a distance and out of her sight; that she always consulted spirits about matters of business, and was directed by them how she should make her will. In addition to this general proof he also adduced evidence of particular business transactions, about which she consulted the spirits. One of these was the transaction with Lehman about the Howard street property, this consultation was through Mrs. Durham as a medium, a witness examined in chief and now offered as a rebutting witness to prove that the testatrix consulted the spirits about her transactions with Lehman in reference to this Howard street property, and about which Lehman had testified as a witness on behalf of the caveatees. Mrs. Scott, the first witness for the

caveator, in answer to the fourth interrogatory, testifies, "in her transactions with Lehman, concerning the Howard street property, I heard her in my presence consult the spirits through Mrs. Durham, as medium; Mrs. Durham wrote upon a slate answers as the deceased would ask questions about that matter; she asked her brother, James' spirit if Lehman would come out all right and pay her, or would he cheat her." Having offered testimony in chief upon this point, as he had the right to do, the caveator should have completed the proof which he had commenced, and examined Mrs. Durham in reference to it when she was upon the stand as a witness in chief; having failed to do this, he cannot afterwards introduce it by way of rebuttal.

The evidence, in regard to this transaction on the part of the caveatees, formed no new point or question first opened by them, within the meaning of the case in 42 *Md.*, 39. It was rather to rebut the presumption of insanity, sought to be established by the caveator's proof upon this point, by showing, that the testatrix, in the whole of that transaction, more than usually complicated, clearly and fully understood what she was engaged in doing. In this exception, as in the first, we think the Court committed no error in rejecting the testimony as offered.

The appellant presented to the Court thirteen prayers, and the appellees eleven, and the rulings of the Court upon these prayers, constitute the subject-matter of the third bill of exceptions. The first and second prayers of the appellant were granted, and the third rejected. It is contended by the appellees, that this prayer was rightly rejected, as it is covered by others, which were granted. If this is so, it furnishes sufficient ground for its rejection. Courts will not grant a multiplicity of prayers substantially of the same tenor, and this Court has always affirmed the refusal so to do. Everything, which is em-

braced in this prayer, is certainly submitted to the jury
by the sixth prayer, which was granted, and which the
Circuit Court thought fully covered it.   But it is contended
by the counsel for the appellant, that he did not obtain
in the sixth prayer the same benefit he would have had
from the granting of the third prayer; because, as he
says, it was the object of the third prayer to aid the jury
in determining what amounted to a state of unsoundness
of mind, which aid was not given, when they were further
required by the sixth prayer, to find directly as a distinct
fact, that the testatrix was of unsound mind.   This argu-
ment is not without force, and would have great weight
if we looked alone to the sixth prayer.   But by looking
back to the first prayer, it will be found to cover fully all
that is contained in the third, to aid the jury in "deter-
mining what amounts to a state of unsoundness of mind."
We cannot, therefore say, that the Court erred in rejecting
this prayer.

The fourth prayer is certainly objectionable in form.   Its
phraseology might well mislead the jury to suppose, that
the Court assumed and believed that some of the important
facts, enumerated in it, had been conclusively established
by the proof in the case.   But the fatal objection to the
prayer is, that facts are mentioned in it of which no evi-
dence is found in the record.   We have been unable to
find that any of the witnesses, who speak of the infirm
health of the testatrix, connect with it even a suggestion,
that she exhibited indications of disease of the brain
before the making of her will.   Many of them speak of
the strange and unusual delusions of her mind, but there
is no evidence of physical disease of the brain.   Nor is
there any proof that she eventually died from paralysis.
Had the prayer been granted, these statements in it,
(unsupported by any proof,) would have gone to the jury
as constituting a part of the evidence in the case, and
might have exercised an important influence in the forma-
tion of their verdict.

The fifth and seventh prayers differ in phraseolgy, but really present to the jury substantially the same question—that is. delusion of the testatrix " as to the character and motives of her near relatives." The Court gave an instruction of its own in the place of these prayers. It will be found to embrace fully the facts to which they refer, but to differ from them by substituting, for the words " a false, unfounded and irrational delusion " used in the fifth prayer, and for the words " the causeless and irrational delusion " used in the seventh prayer, the words *insane delusion.* The issue to which these prayers were directed was the issue of testamentary capacity. The proof of unsoundness of mind, that is insanity, rested upon the caveator, and nothing short of establishing that fact to the satisfaction of the jury would entitle him to a verdict in his favor under the issue. A person entertaining even violent dislike to another may be actuated in so doing from a fancied and unreal cause. He may in this respect be said to be laboring under a delusion. Yet it would not necessarily be such a delusion as would justify his being pronounced insane. The language of the prayers of the appellant is well calculated to mislead a jury. They might infer from it, if the testatrix had no just and sufficient cause for her alleged antipathy to those nearest to her in blood, that it would invalidate her will. This is not sufficient. The delusion, which will invalidate a will, must point to actual unsoundness of mind. In other words it must be an insane delusion ; upon this there seems to be no conflict in the authorities. See 1 *Redfield on Wills,* 74, and cases there cited. The Court, therefore, very properly, in the instruction it gave, told the jury that the delusion, if any, under which the testatrix labored as to the character of her near relatives must be an insane delusion. This we think truly stated the law and could not mislead, especially as by the first instruction the jury had already been informed of the meaning of insane delusion in its legal sense.

The ninth, tenth, eleventh and twelfth prayers, which were refused by the Circuit Court, present the same general objections. They are all referable to the issues of sanity, and must be considered in their application to that question. The testatrix is shown to have been a spiritualist, and a believer in being able to communicate with the spirits of the departed. She consulted and advised with them in her business transactions and followed the directions and advice which she received from them in making the will now in contest. Many of these communications from the spirits are segregated in these instructions, and the Court is asked to say to the jury as a matter of law, that if they were believed by the testatrix, and her will was the result of them, that such will is not valid. These alleged delusions are not presented in the prayers as constituting undue influence, and could not have been so urged in view of what is necessary, under the decisions in this State, to be proved, in order to establish the fact, that a testator has been unduly influenced in the making of a will. They are referable to the issue of testamentary capacity, and the result and meaning of these prayers is to ask the Court to say to the jury that such delusions amount to insanity.

The question of sanity is one of the direct issues upon trial, and it is a fact to be determined and decided by the jury, and not by the Court, upon all the circumstances and proof in the case. The Court cannot say as matter of law, that a person is insane, because he holds the belief that he can communicate with spirits, and can be and is advised and directed by them in his business transactions and in the disposal of his property. He may receive this advice, and act as directed, because he is satisfied in his own mind and from his own reason that the thing recommended is wise and expedient. This is by no means impossible or improbable. Such beliefs do not of themselves afford a certain test of insanity or want of testamentary capacity.

Other circumstances and facts are to be looked to in connection with them, before a satisfactory conclusion can be reached in regard to the soundness of the mind which entertains them.

The impropriety of a Court segregating certain supposed delusions from a large bulk of evidence, and saying to a jury that they alone are sufficient to show insanity, is particularly applicable to this case. Although the proof establishes the fact that the testatrix believed in the most extreme doctrines of spiritualism, of communication and consultation with spirits, there is much evidence adduced by the caveatees, to the effect that she managed her large property with skill and intelligence. Her sanity and testamentary capacity are testified to by some of the most reliable and intelligent gentlemen of the city, where she resided. When about to have her will written, she intelligently informed the distinguished counsel, by whom it was drawn up, how she wished her property disposed of, and furnished him with an accurate and correct list of her numerous relatives. The will itself bears no intrinsic evidence of insanity in its provisions, but on the contrary is such a will as the most sane might have made. All these facts would have been excluded from the jury if the Court, by granting these prayers, had ruled that the delusions and influences enumerated in them amounted to insanity in law.

They were clearly evidence to go to the jury upon the question of insanity, and it was the province of the jury to determine whether in connection with the other proof in the case they satisfactorily established it.

This brings us to the consideration of the prayers granted in behalf of the appellees.

To the first prayer there is no objection. As the due execution of the will and codicils was admitted, it followed of course that the verdict must be for the caveatees upon the issues involving that question.

The second prayer was also properly granted. We can find no evidence in the record legally sufficient to sustain the issue of undue influence. There is no proof that the peculiar ideas of the testatrix, which are supposed to have shaped her will, were the result of any improper design or purpose practiced upon her by another, or that her mind, supposing it to be sane, was so constrained that she has executed a will which she did not approve.

The third prayer instructs the jury that the presumption of law is that the testatrix was of sound mind at the time of the execution of her will, and that the burden of proof is upon the caveator to show that she was of unsound mind at that time. That such is the presumption of law must be considered as well settled in this State. Nor can it be questioned that the burden of establishing unsoundness of mind is upon the party alleging it, and that such unsoundness must be shown to exist at the time of the execution of the will. *Higgins vs. Carlton,* 28 *Md.,* 118; *Tyson vs. Tyson's Ex'rs,* 37 *Md.,* 582. But the objection is made to this prayer, that it is inconsistent with the thirteenth prayer of the caveator, which the Court had granted. We do not understand the prayers as at all inconsistent, and think they can well stand together. The general presumption of law is stated in the prayer of the caveatees, while the prayer of the caveator expressly informs the jury what proof will be sufficient to overcome such general presumption. The respective parties had a right to an instruction upon these points, and we can see no such inconsistency in the prayers as would have justified the Court in rejecting either.

In the fourth prayer, the Court is asked to instruct the jury as to the meaning of the words "sound and disposing mind, and capable of making a valid deed or contract," used in the written law of this State in respect to wills. The definition given is that which has been recognized by the decisions of this Court, 5 *G. & J.,* 301;

28 *Md.,* 118; 43 *Md.,* 479; and being thus established as a correct definition of those words, we cannot see any good reason why the prayer ought not to have been granted by the Circuit Court. The objection that the definition is too general for the facts of this case, we think is fully answered by the addition made by the Court in granting it, and which is to this effect: "The Court grants this prayer as a correct definition of testamentary capacity, to be considered by the jury in connection with all the other instructions granted in the case upon that subject." With this addition there is no ground of complaint by the caveator against this prayer.

The fifth prayer was also properly granted. Its consideration might be dismissed under what has been already said, and without further comment. The mere belief of the testatrix in the various phases of spiritualism, which have been testified to, and which are claimed to be extravagant and unfounded delusions, is not of itself sufficient to prove that she did not possess the capacity that the law requires to make a will. These alleged delusions constitute but part of the evidence, which had been submitted upon the issue of sanity, and the jury could not rightly have been restricted to less than the whole evidence upon which to make up their verdict.

The eighth prayer is but the alternative of the caveator's thirteenth prayer. They both have reference to the legal presumption in favor of the sanity of a testator at the time of the execution of his will. By the prayer of the caveator the jury is told, if the testatrix is found to be of unsound mind prior to the time of making her will, and such unsoundness was of a permanent character, that then the presumption of law in favor of her sanity would no longer exist; while by this prayer they are instructed, if they find such unsoundness to be temporary and occasional, and not permanent and continuing, then the presumption of sanity does arise. We do not think the

prayer objectionable.    It is in accordance with the doctrine
announced in *Brooke vs. Townshend,* 7 *G.,* 31 ; *Taylor vs.
Creswell,* 45 *Md.,* 430 ; and we see no error in granting it.

No objection is stated in the appellant's brief, nor has
any been presented in the argument, to the· ninth and
tenth prayers, and to the instruction given by the Court
in lieu of the seventh.   We suppose none exists.   We
have been unable to find any error in them, and shall
therefore, affirm the rulings which they contain.

We will add, that this case has been presented to the
jury, by the rulings and instructions of the Court, as fully
and fairly as either of the parties could have claimed.   As
we have found no error, the rulings appealed from will be
affirmed.

*Rulings affirmed
and cause remanded.*

(Decided 30th March, 1880.)